UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| **ANNA L. PEAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **1:04-cv-1038-SEB-JPG** |
| **vs.** | ) | |
| | ) | |
| **BRINK'S INCORPORATED,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This matter is before the court on competing motions for summary judgment filed by the

parties.  For the reasons discussed in this entry, we deny Plaintiff's Motion for Partial Summary

Judgment (Docket # 60) and grant Defendant's Motion for Summary Judgment (Docket# 62).

### I.       *Factual Background*

Plaintiff, Anna Peay, was employed as an Account Executive with Defendant, Brink's

Incorporated ("Brink's"), from December 2000 through October 20, 2003.  She was 53 years of

age at the time she was employed by Brink's to work under Regional Director William

Vechiarella, selling the Company's various services in and around the Indianapolis area.  During

the time of her employment, she performed her job well, eventually reaching what she described

as  "phenomenal" commission levels under the Company's sales Incentive Plan.  She also

repeatedly informed those above her that she sought rapid promotion up the corporate ladder.

Despite her frequently voiced ambitions, she was never promoted to any of the posted positions

she applied for or to positions she had heard about via the "grapevine."  This lack of success

greatly discouraged Peay, so she invited Vechiarella, who was based in Columbus, Ohio, to meet with her outside the work environs when he paid a visit to Indianapolis on October 2, 2003 to discuss her career concerns. Vechiarella met with Peay, but his responses were not as encouraging as Peay had hoped, causing her to begin a search for other employment and thereafter to accuse Vechiarella and Brink's of age and gender discrimination.

On Friday October 3, 2003, the day following her meeting with Vechiarella, Peay drafted a memo, which stated in part as follows:

> As a follow up to our meeting on October 2, 2003, I wish to recap the topics we discussed. It was my understanding that we would discuss upwardly mobile career opportunities available for me in the Great Lakes Region. I have requested twice to be considered for the position of Regional Controller. I was advised by you on September 4, 2003 that you have no confidence in my ability to master that position. It is my understanding that you will not be considering me for that position.

> As you and I agreed, we both know that I have been interested in the position of Regional Sales Manager for the three years I have been employed at Brink's. Our first discussion about my interest in this position took place during our initial interview dinner. You advised me on October 2 that while this was a possibility, the position was in the preliminary planning stages and not available. It is my understanding that should this position become available, that you will allow me every consideration for this promotion. ....

The memo also contained a thank-you to Vechiarella for having assigned Peay an additional sales territory and a listing of ten problems she believed Account Executives at Brink's were facing, which she would strive to solve, if ever she would be given a position of leadership.

Apparently, Peay's discontent continued to simmer throughout the weekend, and on Saturday she sent the following e-mail to Vechiarella:

Dear Bill,

I have been thinking about the conversations you and I have been engaged in this year regarding my career opportunities at Brink's.

I do not agree with, nor can I accept your evaluation of my skills and capabilities. I have major concerns that the criteria you use to determine the promotability (sic) of your employees is not applied fairly and equitably to all Brink's employees.

I am asking for an audience with Gary Landry, Gary Taylor, or Greg Hanno to present my concerns. Out of respect for yout (sic) position at Brink's, I did not want to do this without notifying you first.

Gary Landry was the Executive Vice President and Chief Operating Officer of Brink's. Gary Taylor and Greg Hanno were Senior Vice Presidents; Taylor was in charge of Operations and Hanno oversaw Human Resources.

Sunday did not serve as a day of rest for Peay, when she fired off yet another e-mail to Vechiarella, this time stating:

During our meeting of October 2, 2003, I asked that you consider me for a promotion to Regional Sales Manager. You told me that since I have never been able to get administrative assistance from Brian Johnson at the Indianapolis branch that this somehow implies to you that I do not possess competent leadership skills. Therefore, since I do not demonstrate competent leadership skills, you would be reluctant to consider me for a leadership position in your region.

On Friday, October 3, 2003, I chaired a meeting with Brian Johnson and Marsha Hill. I asked them why they do not provide administrative assistance to me at the Indianapolis branch. Brian told me that he feels he is already providing administrative help to several branches with fewer front office personnel than any other branch in your region, and he is not able to provide the additional support to me. Furthermore, he said if you would ask him he would tell you the same thing.

Bill, when I interviewed with you in 2000 before accepting the Account Executive position at Brink's, you told me that I would have 20 hours of administrative assistance to use at my discretion. I have never received this administrative assistance. This issue is, always has been, and continues to be between you and Brian Johnson. I wish to reiterate that even though

-3-

administrative assistance would help me produce even more new revenue for your region, I do not expect nor do I receive any assistance from the Indianapolis branch.  I am declining to take ownership for the actions of the Indianapolis branch, and I ask that it not be considered as part of the criteria you are using to determine the competency of my leadership skills and capabilities.

During our meeting on October 2, 2003 you also told me that Brian Johnson calls you every few months to tell you that he can't stand me, and is having some undisclosed problem with me.  I discussed this with Brian Johnson during the October 3, 2003 meeting, and he denies making these calls to you.

That same day Vechiarella responded by email to Peay's comments regarding the

Indianapolis Branch Manager, Brian Johnson, who also reported to him:

Anna, I never said that Brian told me he can't stand you.

I will save my comments until all three of us are together since Brian and yourself have never been able to get on the same page, from my perspective unless we are all together in one room at the same time.

I am glade (sic) you had a meeting with Brian but I do not see any progress in your comments here.

There is more than enough staffing in the Indy branch to support any administrative help you need with contracts.

My hopes are that Brian and yourself are able to resolve this local issues.  I will continue to empower you to resolve this issue.  I will wait on a solution from both of you on this very old subject.

Please let me know the outcome.

On Monday, October 6, 2003, Peay sent the following e-mail to Landry, Taylor and

Hanno:

Gentlemen,

I am requesting an audience to discuss Bill Vechiarella's behavior.  Bill Vechiarella has insulted me, demeaned me, accused me unjustly of

-4-

incompetencies, and denied me promotions based on his personal prejudices against my age and gender.[1]

Peay's October 6, 2003, e-mail prompted an immediate response from Hanno followed by additional exchanges between them. First, Hanno wrote back, stating:

> Anna, I am in receipt of your comments about Bill Vechiarella which trouble me. I would like to understand the issues and will handle this as a Direct Access.[2] Please advise when I may discuss the facts surrounding this with you.

Peay replied:

> Will I be allowed a meeting or a (sic) just a telephone call? I am preparing a presentation for a meeting which should take me approximately a week to compete.

Hanno responded:

> Anna, tell me what you prefer and when, and I will see what can be done. I want to handle the matter as a Direct Access and keep the discussion and fact finding with Human Resources before arriving at any conclusion.[3]

---

[1]Peay was asked in deposition to explain the accusations against Vechiarella she made in this e-mail. She stated that she was insulted when Vechiarella told her that he had asked another individual instead of her to fill in for John Radman, a nearly 40-year sales veteran with Brink's who served as Director of Sales Training, because he felt she would have given him some "push back" if he had asked her to do so. She testified she was also insulted by Vechiarella always putting her "in the middle" between him and branch manager Brian Johnson. She states that she was demeaned by Vechiarella when he insinuated that she would not be available to travel if hired as Regional Controller because he thought she was still caring for her sick mother, when in fact that burden was no longer relevant because her mother had passed away. According to Peay, Vechiarella "unjustly accused her of incompetencies" because she had worked for him for three years and he still questioned her leadership skills and qualifications for the Regional Controller position. She believed Vechiarella was gender and age biased because she saw younger men, whose talents and qualifications she questioned, receive promotions while she remained an Account Executive.

[2]Brink's had what was known as a "Direct Access" policy which allowed employees a choice to bypass local and regional supervision with serious complaints and have them heard at the national corporate level.

[3]On behalf of Brink's, Hanno and the Vice-President of Human Resources, Jim Spurlock, undertook an investigation of Peay's accusations against Vechiarella, including looking into the

Within a day or so, Peay received notice from Vechiarella that he would be coming to Indianapolis to meet with her and the branch staff regarding the administrative issues of which she had complained to him, which prompted another e-mail from Peay to Hanno on Wednesday, October 8, 2003, as follows:

> Good Morning Greg,
>
> I am compiling information and documentation for my presentation to you, and I believe that I will have it all typed up by Wednesday, October 15.  I would really like to call you at that time to check schedules.  I would love to have a private audience with you here in Indianapolis, off site from the branch.  If that doesn't work for you, I am more than willing to come there for an off site meeting with you.
>
> On another note, Bill called me yesterday.  He is scheduled to come to Indy on Thursday and Friday, and plans to meet with me, and Brian and Marsha from the branch, to resolve the ongoing issues about administrative help.  Since Bill rarely comes to Indianapolis, my fear is that he is coming to terminate my employment with Brink's.  If that is the case, I would appreciate knowing this in avance (sic) from you.  I have many personal items, decorative items, and awards in my office I would like to keep.
>
> Please advise.

Hanno responded, urging her to have a frank discussion regarding her concerns with Vechiarella when he came to Indianapolis.  Peay apparently took Hanno's advice, as evidenced in an e-mail she sent to Vechiarella that same afternoon, to wit:

> Hi Bill,
>
> Since you are planning on being in town for two days (a rare treat that I look forward to by the way), perhaps you would entertain having dinner with me Thursday evening.  If you would consider it, I would share my fan with you if you need it.  It is only about 110 degrees in the office, today.  It seems we are for some unknown reason traveling on different paths, and my road is too bumpy without you.  I'd like to see if we can talk off site about this, and see if we can get

---

five promotions she said she had been denied.  Hanno maintains that the investigation turned up no evidence of improper conduct or discrimination on the part of Vechiarella.

back on the same road.  I miss the trust and respect we have always shared in the past, and want it back.

If you can have dinner with me on Thursday, I'd like to wait for the pow-wow with Marsha and Brian until Friday.  Brian is all upset, and as God as my witness, I do not want to make his face any redder than what it is.  Brian shoulders a pretty heavy load himself, and I have always wanted to support him, not be an aggravation to him.  If you already have plans I understand.  Maybe we can do it another time if you're busy.

Vechiarella and Peay met that Thursday evening, during which meeting Peay informed Vechiarella that "it isn't going to work."  She explained that she had developed a plan to transition out of her employment with Brink's, using the next couple of months to pursue her contacts to network for a job.  She had already had a telephone interview with American Express and expected they would be getting back with her shortly for a second talk.  Despite Vechiarella's plea for her to continue on at Brink's, Peay indicated that she wanted an exit strategy that would allow her to remain through the end of the year, earn commissions which were then in the pipeline and then move on to greener pastures.  According to Peay, Vechiarella told her he wanted her at Brink's for as long as she wanted to stay and that she would have a job with him until she turned in her resignation.  Plaintiff conceded in her deposition that this conversation with Vechiarella provided notice to Brink's of her intention to quit, thus giving the Company three months advance notice of her departure.

Unfortunately for Peay, the Senior Vice President for Operations was not as understanding as Peay represents that Vechiarella was.  When he learned that Peay was actively seeking alternative employment as a part of her "exit strategy" to transition to new employment, Taylor invoked the "discretion of Brink's management"policy pursuant to Section 5.1 of Brink's Policy 5-2, which allows termination of an employee as soon as notice is provided by the

employee that she intends to terminate her employment relationship.  On October 16, 2003, Taylor sent the following e-mail to Hanno:

> Greg, having reviewed your e-mail concerning Anna Peay's intent to leave by year end, it makes no sense to me that we would allow her continued employment.  My intent would be to let her go immediately.  John Radman, Direcor of Sales Training, is located in Chicago and could drive down to handle Anna's termination tomorrow.

Landry, who was copied on Taylor's e-mail, sent a reply to Hanno and Taylor indicating his agreement with Taylor's conclusion that Peay should be terminated immediately.  In his affidavit, Taylor claims that Peay's active pursuit of employment with others led him to conclude that Peay no longer possessed the loyalty or commitment to Brink's that he expected of those entrusted with the Company's confidential information.

On October 20, 2003, Radman traveled to Indianapolis and advised Peay of Taylor's decision to terminate her employment.  In response to that notification, Peay sent an e-mail to Hanno expressing her disappointment but indicating that she was not surprised about her termination.  Peay further stated that she would not sign the letter of dismissal which Radman had provided that set forth proposed severance terms and that she was willing to negotiate a "more equitable" agreement.  Attached to her e-mail was a draft memo which she had prepared stating she had always hoped to retire at Brink's.  In addition, her memo recited the five promotions she had sought but did not receive while working as an Account Executive with Brink's .  The memo, in pertinent part, read as follows:

> 1 - Approximately two years ago, I met with John Radman to discuss the NAM *(National Account Manager)* position in the Great Lakes region.  He discouraged me from continuing my pursuit citing my lack of experience dealing with the Regional Directors as being a disadvantage for me.  I declined to pursue it further.
>
> 2 - I have spoken on several occasions with Bill Vechiarella about the possibility

of a position as Regional Sales Manager for the Great Lakes Region.  This position has never materialized.

3 - I inquired about the position of Regional Controller for the Great Lakes Region a year and a half ago, and was told by Bill Vechiarella that he would not consider me because I did not have any actual controller experience.

4 - Recently I applied again for the position of Regional Controller for the Great Lakes Region, and was again told by Bill Vechiarella that I did not have controller experience.

5 - I applied with Gary Landry for the position of Director of Sales and Marketing, but I have had no response from Gary.  I consider myself a very serious candidate for this position, and would like for you to provide me with feedback as to the status of my application.

Peay's memo concluded with a list of eight men whom she said had received promotions or other opportunities to expand their responsibilities during her tenure at Brink's .  Peay thereafter wrote another memo to the CEO and the Board of Directors articulating her complaint that she was the victim of discrimination.

On December 10, 2003, the Vice-President of Human Resources, Jim Spurlock, provided Peay with the Company's response to her Direct Access Complaint, including her allegations against Vechiarella and claims of discrimination in connection with her pursuit of promotions. In relevant part, Spurlock's response read:

Your letter began with a reference to promotional opportunities which you stated were denied to you because of your age and gender.  You listed the specific positions in question in your email to Greg Hanno dated October 21, 2003, and further described to me in a conversation on November 10, 2003.  I have examined the circumstances related to each position, and the results of my review are described below:

1)      National Account Manager: your email to Mr. Hanno states that John Radman discouraged you from pursuing this position.  I have spoken with Mr. Radman and he denied that he said anything that you should have perceived as discouraging.  Also, I have reviewed an email you sent to Mr. Radman in which you declined this position and stated, "I love that I was seriously considered for the position."  I have attached a copy of this email to refresh your recollection.

The text of the email clearly suggests that you voluntarily removed yourself from consideration.

2)      Regional Sales Manager - Great Lakes Region: as you are aware, this position has never been established in the Great Lakes Region.  As a result, there has never been recruitment for this position.  I am advised, however, that you would have been considered for it if it ever materialized, and if you applied.

3)      Regional Controller - Great Lakes Region (2001): In our conversation you conceded that you would not have been qualified for this position, and Bill Vechiarella confirmed that he expressed this opinion to you as well.  In any event, I have reviewed your education and experience as compared to the person appointed to this position, and it is clear that he was more qualified for the position.

4)      Regional Controller - Great Lakes Region(2003): again, Mr. Vechiarella has stated that he did not consider you qualified for the position.  It seems you may have agreed as you told me that you believed the prior incumbent could train you in the duties of the position.  The requirements for this position included 7-10 years of experience in the field of accounting and finance, with an MBA a "plus."  Both of the persons appointed to this position had such experience and MBA degrees while you did not.

5)      Director of Sales and Marketing: there has never been a decision made to recruit for such a position.  As noted above regarding the position of Regional Sales Manager, I am advised that you would also have been considered for this position had it been established, and had you applied.

In conclusion, of the five positions you listed, I have found that you voluntarily declined one, you were not sufficiently qualified for two others and the two other

positions were never recruited for nor filled.  I cannot conclude that you were discriminated against under these circumstances.

I have also considered your comments concerning the males listed in your email to Mr. Hanno, and the positions they attained.  I have found nothing unusual about any of these appointments, and each person was well-qualified for the position attained.  Also, all but one of the positions noted are operational jobs for which managerial or operational experience is considered important.  You advised me that Mr. Vechiarella explored with you other opportunities such as to be considered for Coin and Armored Branch manager positions and for Assistant Controller, but that you declined to pursue any of these opportunities.  These positions would have given you an excellent opportunity to gain experience that could have enhanced your qualifications for higher-level jobs in management.

-10-

After a full investigation of Peay's complaints, Brink's concluded that there had been no inappropriate bias evidenced in any of the employment decisions made with respect to Peay. Vechiarella hired a 41-year-old woman to replace Peay.  Following receipt of Spurlock's letter, Peay continued to correspond with Brink's asserting an entitlement to unpaid incentive plan commissions.  Brink's gave Peay a post termination payment of $15,987.50 which Brink's asserts was in complete satisfaction of all amounts due under the incentive plan.  Peay disagrees, claiming she is entitled to something in excess of $5,000 in additional commissions.  Peay's lawsuit alleges discriminatory failure to promote, retaliatory discharge and her claim for additional commissions.

## II.     *Summary Judgment Standard*

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment.  *Id*. at 322-23. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Celotex*, 477 U.S. at 322-24; *Anderson*, 477 U.S. at 249-52).

-11-

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge*, 24 F.3d at 290. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir. 1997). If genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Waldridge*, 24 F.3d at 920.

### III.    Discussion

In her filings with the court, Plaintiff describes an atmosphere of discrimination at Brink's so pervasive that an older woman had literally no hope of ever being treated as an equal. She depicts a workplace full of the stereotypical attitudes which have long hindered the progress of working females and which gave rise to Congress's original decision to enact important civil rights protections as embodied in Title VII and the ADEA. The difficulty for Peay in waging this litigation is that by law more than a "call to battle" in her self described "battle of the sexes" is required to prevail. We examine the admissible evidence to determine whether a violation of federal civil rights laws has occurred; admissible evidence in support of her claims is woefully lacking here. Peay offers her own interpretations and opinions concerning events which occurred, along with affidavits from former Brink's employees who offer their own opinions, speculations and hearsay, but nowhere is there factual support in the form of first-hand personal knowledge to support Peay's allegations.

**A.**    <u>Failure to Promote</u>

Indiana, which is a deferral state, requires that in order to pursue a Title VII claim in federal court, a plaintiff must first file a charge of discrimination with the Equal Employment Opportunity Commission within 300 days from the date of the alleged discriminatory action. *Doe v. R.R. Donnelly & Sons Co.,* 42 F.3d 439, 445 (7th Cir. 1994).  Age discrimination charges must be filed with the EEOC within 180 days of the alleged discriminatory act.  *E.E.O.C. v. North Gibson School Corp.*, 266 F.3d 607 (7th Cir. 2001).  Peay filed her charge of discrimination on December 4, 2003.  The discriminatory acts complained of (other than her termination) are the promotions which Peay asserts that Brink's denied her.  Accordingly, Peay's pursuit of the National Account Manager and Regional Controller jobs in 2001 is time-barred and must be dismissed on that basis.

Next, we examine whether Peay has established a prima facie case of discrimination with respect to any of the three remaining non-promotions.  Where, as here, a plaintiff has no direct evidence of discriminatory intent, she may attempt to prevail under the indirect method, commonly known as the *McDonnell Douglas* burden shifting paradigm.  This method requires that Peay establish the elements of her prima facie case by a preponderance of the evidence; then, if she succeeds in that effort, Brink's must counter with a legitimate, nondiscriminatory and nonpretextual reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  This analytical template applies whether the discrimination is alleged to have been based upon gender under Title VII or age under the ADEA.  *Jordan v. City of Gary, Ind.,* 396 F.3d 825, 833 (7th Cir. 2005).  To establish a prima facie case, Peay must proffer  admissible evidence to support the following four propositions: 1) that she was a member of a protected

-13-

class (over 40 for the ADEA and female for Title VII); 2) that she sought promotion to a position for which she was qualified; 3) that she was not promoted to the position she sought; and 4) the position was filled by a person outside the protected class.  *Id.*

Peay first sought the position of Regional Controller at the very end of calendar year 2001, when, in the midst of her first annual review, she and Vechiarella discussed that job opening and whether she had the necessary qualifications to fill the position.  We have previously ruled that her claim of discrimination based on her 2001- 2002 pursuit of this position is untimely, but her 2003 pursuit of the same position requires further discussion since it is not time-barred.  According to 's,'s, Peay was not given serious consideration for the position in 2001-2002  because she lacked the type of necessary financial experience to perform the duties of Controller. Peay counters that she had an accounting emphasis in her college business studies and had valuable experience inside the Company, compared to the individual hired for the position who had come from outside Brink's .  That outside candidate, Lowstetter, moved from Comptroller to another position within Brink's a year after being hired, necessitating another posting of the vacancy by the Company available to applicants within the Company as well as outside, in an effort to recruit suitable candidates.  Peay applied for the position a second time. The job posting included a requirement that candidates possess at least seven years of "relevant operations management experience in the field of accounting and finance" and further that an MBA would be "a plus."  The persons hired to fill the Controller openings on both occasions were from outside the Company and satisfied those qualifications; Peay had neither.

With respect to her ADEA claim, Peay has made no effort to establish that the ages of either Lowstetter or Perrault, who was hired for the 2003 opening, were significantly different

from hers.  She simply asserts that we should assume the two hirees were ten years her junior because Brink's has failed to provide any information regarding their ages.  It is Peay's obligation, however, not Brink's, to come forward with evidence to support that contention. Thus, with respect to her ADEA claim, in addition to her failure to establish that she has met the qualifications requirements for the position, Peay has failed to establish that a person whose age placed him outside her protected class was awarded the job.

Plaintiff has established that both Lowstetter and Perrault are males and therefore not members of Peay's protected gender classification for purposes of her Title VII claim.  However, Peay has failed to establish that these individuals were "similarly situated at the time of the alleged discrimination against her."  *Id*. at 834.  Because Brink's chose to hire from outside its then-current employee base, rather than from within, the essential question is whether Peay had similar qualifications as the person(s) selected.  Based on the published qualifications for the position, we harbor some doubt as to whether Peay was qualified for the job; but, accepting as fact Peay's otherwise unfounded speculations that many males holding upper management positions lacked the post-secondary education or years of experience typically associated with the relevant positions, both Lowstetter and Perrault would be the exceptions to Peay's characterizations since each of them had education and practical experience which far exceeded that of Peay. Consequently, her claims of gender-based discrimination with regard to the Regional Controller position cannot succeed.

Peay claims that in late summer, 2003 she heard "through the grapevine" that Brink's was going to be hiring a Regional Sales Manager for her region as well as a National Director of Sales and Marketing.  She made it known to Vechiarella that she was interested in the Regional

Sales Manager position and sent an e-mail to Executive Vice President and COO Gary Landry
on September 5, 2003, offering herself as a candidate for Director of Sales and Marketing.  She
did not receive a promotion to these positions; however, neither did any other Brink's employee
while Peay was employed there.

Brink's argues that the Regional Sales Manager position was only in the formulation
stages when Peay discussed it with Vechiarella and that no opening ever was created for a
National Director of Sales and Marketing.  Peay counters citing an affidavit from Eric Perez, a
Brink's Account Executive, who attended the June 2004 Brink's sales conference (more than
seven months after Peay had been fired) at which it was announced that Mark Jones had been
hired to serve as Vice President of Sales and Marketing.  In his affidavit, Perez also asserted that
sometime following that 2004 sales conference, John Radman was appointed Regional Sales
Manager.  Peay argues that, because Brink's has not submitted job descriptions for these
positions to the Court, we must accept her explanation as fact that the national sales position
about which she e-mailed Landry ultimately became the Vice President of Sales and Marketing
position and that she was qualified for both the VP and the Regional Sales Manager positions.
Among the clear deficiencies in her argument, Peay completely skips over the fact that neither of
these positions was filled by Brink's until long after she had announced her intention to seek
alternative employment and thereafter was relieved of her position.  Plaintiff's failure-to-
promote claim regarding positions not actually available to her, given that they were not filled by
Brink's until seven months or longer after her departure, plainly lacks merit, especially since she
has failed to establish that after rejecting her, Brink's continued to seek applicants having the
qualifications she possessed.  *See McDonnell Douglas,* 411 U.S. at 802 (1973); *Petosino v. Bell*

*Atlantic*, 385 F.3d 210 (2nd Cir 2004).  Accordingly, Brink's is entitled to summary judgment on all of Peay's claims of discriminatory failure to promote.

      B.    <u>Retaliatory Discharge</u>

Peay also maintains that her termination occurred in retaliation for here having complained of age and gender discrimination.  In order to prevail on such a claim under Title VII or the ADEA, pursuant to the direct method of proof, Peay must produce evidence to establish that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action taken by her employer; and (3) a causal connection between the two exists.  *Moser v. Indiana Dept. Of Corrections,* 406 F.3d 895, 903-904 (7th Cir. 2005) (retaliation claim under Title VII); *see also, Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)(retaliation claim under ADEA).  In the absence of direct evidence that the termination was retaliatory, under *McDonnell Douglas* the burden-shifting analysis begins by requiring Peay to establish a prima facie case, showing that:  (1) she engaged in a statutorily protected activity; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly-situated employees who did not engage in statutorily protected activity.  *Moser,* 406 F.3d at 903.  If Peay is able to establish a prima facie case, the burden shifts to Brink's to present evidence of a non-discriminatory reason for its actions.  *Id.* at 904.  If Brink's successfully meets that obligation, the burden shifts back to Peay to demonstrate that the employer's reason is pretextual. *Id.*

The first three elements of Peay's prima facie case are not at issue: she complained of discrimination, she performed well as an Account Executive and she was fired after word of her

job search and decision to leave her position with Brink's reached upper management. The remaining issue arises over whether other employees similarly situated, who had not complained of discrimination, were treated more favorably. Those persons similarly situated to Peay at that time would have been Account Executives or others entrusted with similar responsibilities within Brink's, who let it be known to management that they were actively pursuing a change in employment.

To support her assertion that other similarly situated employees were treated more favorably, Peay references the affidavit of Jim McGuffey, a former Brink's employee, who was let go and now works for a competitor, Loomis, Fargo & Co. McGuffey had been a Regional Director for Brink's . His affidavit primarily reflects his view that Brink's moved away from its "core values" by failing to emphasize safety and training, which may be true but it has no relevance here. Regarding the treatment of Brink's employees who were known by him to have sought work elsewhere, he offers nothing more than his own speculations, relying on hearsay and unfounded, unsubstantiated assertions.

In paragraph #17 of his affidavit, for example, McGuffey reports that in 2003 a male Brink's Branch Manager, who had 24 years of experience with the Company, was fired the day after it was learned that he had interviewed with Loomis. However, no explanation of the basis for McGuffey's information (i.e. as supervisor of the Brink's employee, from others at Brink's, from the employee after he got to Loomis?) has been provided, but even if it were properly authenticated, it corroborated Brink's argument not Plaintiff's.

In paragraph #19 of McGuffey's affidavit, which is at best confusing, he asserts that

-18-

certain upper level managers at Brink's were aware of a District Manager who had accepted the "#2 spot" with a competitor, but was allowed to continue working while Brink's attempted to find him a position in the geographical region he preferred.  However, the affidavit also claims that that individual was terminated within 24 hours of the Brink's CEO learning of the acceptance of the position with the competitor.  Again, we are left uninformed regarding the basis of McGuffey's knowledge and, again, the information in any event supports Brink's position, not Plaintiff's, in this litigation.

The McGuffey affidavit contains additional unfounded statements regarding various employees who left Brink's for other employment and were allowed to continue working  at Brink's until their final departing dates.  Even if McGuffey acquired this information directly from his own first hand sources or from some other similarly reliable source, none of the individuals he references ever actually held the position of Account Executive, and the record is devoid of any other basis that would allow us to conclude that they were similarly situated to Peay.  McGuffey's affidavit is typical of the broader deficiencies characterizing all the other evidence relied upon by Peay in support of her case; her submissions are rife with opinion, speculation, hearsay and other inadmissible proffers.

Thus, Peay has failed to establish a prima facie case of retaliation because she has not established that other similarly-situated employees were treated more favorably than she was.  In fact, her submissions leave no real doubt as to the real reason(s) she was let go.  By informing her superiors three months prior to her departure that she intended to use her client contacts to actively seek employment outside the Company, she took a calculated risk and in response Brink's decided to terminate her employment at the time of her notice to them that she was

leaving.  There was no legal impropriety on the part of Brink's in taking such action to terminate Peay's employment immediately, and Brink's is thus entitled to summary judgment on Peay's retaliation claim.

C.   Commissions Due

In our entry of October 11, 2005, we denied Peay's attempt to obtain summary judgment against Brink's for commissions she maintained were owed her.  We will not reiterate that holding here, but we note that Plaintiff has provided nothing additional in response to Brink's pursuit of summary judgment that would alter our initial determination, other than a copy of the Incentive Plan, which both parties agree applies in calculating commissions owed, and her own self-serving affidavit asserting that she is owed commissions for securing business from four named clients.  Brink's provides its own self-serving affidavit from its compensation manager indicating that Peay has been paid all that she is owed, drawing upon the language of the plan to emphasize that conclusion.

Brink's cites an important provision of the Incentive Plan, as well as Peay's deposition testimony revealing her understanding of that language, to demonstrate that the commissions Peay claims are owed were in fact not yet earned.  The New Account Incentive, which is part of the Incentive Plan and rewards Account Executives who establish new accounts that generate profitable business, provides for commissions at the rate of two, three or four percent of annualized revenues, depending on the type of business contracted for, with payment "made monthly upon submission of a signed agreement or contract for services, together with invoices for two consecutive months."  Peay has testified that she understood that the contract and two

-20-

months of invoices were a prerequisite to an account qualifying for a new account commission. Brink's has established without controversy that Peay did not submit any such agreement or the required two months of invoices for any of the accounts for which she now seeks unpaid commissions.

Under Indiana law, an account representative employed on a commission basis is entitled to receive commissions earned while employed even after her termination, unless there is a contrary written agreement with respect to a "different compensation scheme." *Sample v. Kinser Ins. Agency, Inc.*, 700 N.E.2d 802, 804 (Ind. App. 1998). Here, the parties agree as to the applicability of the written Incentive Plan regarding eligibility for commissions. Brink's has offered an explanation in support of its post termination payment to Peay of $15,987.50 as complete satisfaction of amounts due under the agreement and further to establish that the four accounts for which Peay claims entitlement to commissions did not in fact qualify for commissions. Peay's inability to prove, either by documentary evidence, by deposition or by affidavit, that she had obtained all the required documentation and submitted it to Brink's by the time she was terminated defeats her claim that the commissions she seeks were earned by the time she was terminated. Consequently, Brink's is entitled to summary judgment on this claim as well.

*IV.*     ***CONCLUSION***

For the reasons set forth above, Plaintiff's Motion for Partial Summary Judgment on

Title VII and Age Discrimination Claims (Docket # 60) is DENIED.  Defendant's Motion for

Summary Judgment (Docket #62) is GRANTED.  A final judgment shall be entered accordingly.

All other pending motions are denied as moot.

IT IS SO ORDERED.

Date:   November 23, 2005

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kimberly G. Baldwin
KING PAGANO & HARRISON
kbaldwin@kph.com

James E. Kellett
KING PAGANO & HARRISON
jkellett@kph.com

Mary J. Hoeller
mary@attorneyhoeller.com